The Illinois Department of Court's 6th Division is now in session. The Honorable Justice Mary L. Pickpocket is presiding. Please have a seat. Good afternoon and welcome. We are so excited to be back in person and back here with you. Would you please call the case. Case number 1-21-0021, American Guarantee & Liability Insurance v. EXP US Services. Before you stand and before you begin argument, would each of you, beginning with the appellate, give us your name and also would the appellate tell us if you want to reserve any time for rebuttal. Good afternoon, Your Honor. Adam Hawthorne, appellate. Yes, I'd like to reserve my time for rebuttal. Counsel. Good afternoon. Brian Gallagher, I'm the appellate. Mr. Fong, whenever you are ready, we are ready. Good afternoon, Your Honor. May it please the Court. As I just said, my name is Adam Vaught and I represent Defendant Appellant EXP US Services, Inc. The issue on appeal here is an insurance coverage issue. The trial court below found that EXP was not covered on an insurance policy issued by EXP. It was issued by AGLIC for two reasons. One, it found that the professional services exclusion applied to exclude EXP for the allegations that were raised. And second, it determined that EXP's policy that was issued by Beazley came before AGLIC's policy. So first, I'd like to discuss the professional services exclusion, why the trial court was wrong to apply that, and then I'll get to the larger coverage issue. And you have to win both of those, right? Yes, Your Honor. I mean, if the professional services exclusion applies, then we're out. And if you find that it doesn't apply but the coverage comes second, then yes, we would be out. But the good news is that's not what we can do. So on the professional services exclusion, the trial court took a view that was too narrow for what it should have done and determined whether or not the professional services exclusion applied. The allegation against EXP related to a motorcycle accident involving the plaintiff in the underlying lawsuit, Mr. Sitz. He hit a manhole cover on the Algonquin Bypass Project at night. Hit the manhole cover that was raised, was flown very far, broke his spine, lost sight of his eyes. Terrible accident. Everybody who was involved in the project got sued and then cross-sued. What EXP had been retained for is EXP is an engineering firm, but the allegations specific to the claims against them were beyond just professional services. It included that they didn't rise the manhole cover, they failed to post warning signs, they didn't close the part of the road where the manhole cover was raised. Can you talk to me about whether we're talking about a duty to defend or a duty to indemnify? Because it seems to me that on this exclusion particularly that's important, and you seem to disagree with each other about which applies. I think we're talking about both, but they are different, of course. So on the duty to defend, the analysis that the court takes in the case law is that... And the reason you think that we are also looking at the duty to defend, even though the case has been settled, is that what? EXP had large defense costs that no one covered. In the record, there's at least $500,000 that EXP paid for out of pocket. The underlying BITCO policy... But isn't the real issue, though, is that if it's an excess policy and not a primary policy, the BITCO policy I'm referring to, then the analysis is the same, whether you're talking about the duty to defend or the duty to indemnify. Well, I think the way that the policy is written... So you talk about an excess policy versus a primary policy. I think the way that the AJLIC policy is written is even though it's called an excess, it actually will operate as a primary. And so when the underlying BITCO policy exhausted, it should have gone into coverage into the extra million dollars. This is part of the Arrow Road contract that Arrow Road was supposed to secure as primary coverage. Let me just sort of... So with the duty to defend, we look at the complaint. The duty to indemnify would determine, like, are there actually allegations that establish that it goes within to coverage. So I think on the duty to defend, there should have been a defense triggered because the BITCO policy, which had a duty to defend also, the AJLIC policy follows that. The BITCO policy was exhausted, so that would have triggered then the duty to defend that is within the AJLIC policy. And so the reason that we're arguing also that the duty to defend is triggered, because that should have covered defense costs. And as of yet, EXP has not been provided any defense costs. So that's the distinguished distinction when we're talking about the duty to defend versus the duty to indemnify. And it doesn't matter that we now know exactly what liability was based on because there were defense costs never covered. So on that part, we look to the duty to defend standard. Yes, on that part. Then we get to the duty to indemnify. So on the duty to indemnify, we just look at the allegations. That's what all the case laws say in the complaint, to look in the four corners. If it can fall within that, the nationwide versus State Farm case that was recently out of this court said even if there's one allegation that falls within coverage that you have to defend. Now, on the duty to indemnify, which is narrower, you then look to specific evidence. Now, we cited the Thomas Engineering case, which is a Rule 23 case. It didn't create new law, which is why it's Rule 23, but it clarified at least on a judgment of the pleadings looking at whether or not there was a duty to defend. Similar allegations were determined to fall outside of the exclusion. Similar to here, when you talk about a professional service, it's something that is mental or intellectual requirements, whereas if it's not that, then just because somebody is a professional doesn't mean that it's a professional service. As an example, I'm a lawyer. I drove here today. I'm a professional. I'm arguing before an appellate court that I can only do with a law license. But if I drove here and hit somebody, I didn't do that as a professional. In fact, it's probably the very opposite. That's right. I was thinking too much about this. But in that case, the mere fact that I am an attorney doesn't mean that the professional services exclusion applies one way or the other. Here, the fact that EXP was accused of not putting warning signs, as an example, is something that would take it out of professional services. You don't need professional training. It doesn't require mental or intellectual effort to see a manhole cover on a road and say that could be dangerous. Somebody could get hurt. Likewise, to close a road or to barricade it to say don't drive down there because you could get hurt, that doesn't require any specialized training. It doesn't require any mental or intellectual skills that would make it a professional service. And so you see in the complaint that there may be allegations that are related to professional services, but then there can be allegations that are outside of professional services. That's what the national, I'm sorry, the nationwide versus state firm decision said, that as long as there's one allegation that is covered, then it's all covered on the duty to defend. Now, on the duty to indemnify, AGLIC wants to ignore the complaints and say the allegations in the complaint don't matter, and all what they want the court to focus on is what they refer to as the extrinsic evidence. That was the contract that EXP entered into with the Department of Transportation that provided scope of work. Two depositions from EXP employees in the underlying lawsuit that discussed generally what... And their contract was with the Department of Transportation, not with Passion, correct? Yeah. I forget exactly how it breaks down. I apologize, Your Honor. But Passion did have a contract with AeroRoad, I believe. But not with EXP. EXP was with the Department of Transportation. Yeah. And Passion contract then said that EXP and the Department of Transportation had to have coverage through AeroRoad. But the scope of the work contract, they argue that because it was a professional contract, that it's professional services. Again, to use the attorney analogy, because that's what we all know, I have an engagement letter to represent EXP. But again, if I get in an auto accident on my way here, that's not professional services. Likewise, if somebody comes to a law firm and they slip and fall in the lobby, that's not a professional service. That would go to your general liability because it's negligence, whether it's water left on the floor or whatnot. Also, they look to the XL policy that EXP had to say that the fact that EXP did not challenge that is, I guess, somehow dispositive that XL's interpretation is binding. I completely disagree with that. The fact that EXP didn't go after XL when they declined coverage was for two reasons. One, the mere fact that they said that doesn't mean that it's binding on EXP, that it's a concession that they were correct. And second of all, it's not in the record. There was another reason why that insurance policy didn't cover it, and that was based, too. There was a location exclusion, and the location of this project wasn't located on it. And then they also argue that because Beasley did pay and that Beasley was a professional liability contract, that that's somehow dispositive. But simply because Beasley decided to pay, it doesn't mean that that excludes AGLIC. Because, you know, it's nationwide. Well, it's because they're arguing that the BITCO policy and the Beasley policy were both primary insurance policies. They're relying on our Supreme Court's decision to say that the excess policy doesn't kick in until the primary policies have been exhausted. Right. So let me walk through how I think that the AGLIC policy should be interpreted. So there is the Arrow Road contract, which said that Arrow Road was supposed to secure $2 million in primary coverage and $5 million in excess coverage. The BITCO policy had $1 million in coverage. The AGLIC policy has a schedule that refers to the BITCO policy as other insurance, and it says that it will follow in excess the primary policy, and that's to other insurance. And the exception is if, you know, there's no longer insurance available for any reason other than exhaustion, then that doesn't follow. But the BITCO policy was exhausted. The policy was paid and it was tendered, and the EXP got part. Another one of the companies got part, but the million-dollar policy was exhausted. So under the contract that should have secured $2 million, the AGLIC insurance policy says that it's going to follow the BITCO policy. Now, the trial court interpreted this to say, well, there could possibly be other primary policies out there, so it's possible that, you know, that would come before this one, which would be excess. But that's not how AGLIC wrote it. And the Supreme Court has said that, you know, insurance policies are supposed to be interpreted, you know, against the insurer if there's ambiguity. And, you know, AGLIC was aware that, you know, AeroRoad had a contract, or at least it should have been. And if they wrote it and didn't clarify that any other insurer, if they have a primary policy, that that comes in before theirs, they could have wrote that. But they didn't. They specifically wrote that it will follow the BITCO policy, which was in the schedule. And furthermore, in the other insurance, it actually does reference contracts because it says that if there is a contract, then the limits of that policy are whatever the limits are in the underlying contract. So in this case, there was $2 million that was supposed to be provided in primary coverage, $5 million in excess. The AGLIC policy had $15 million in coverage. But that provision now narrows that, at least as far as it concerns to EXP, to what the numbers were that were provided in the contract. So even though it's referred to as excess, when you read the AGLIC policy in conjunction with AeroRoad, in conjunction with the BITCO policy, it flows from the BITCO policy when it's exhausted to then provide the coverage. Because it is supposed to follow. But they're arguing that the Beazley policy, which was EXP's own policy, was also a primary policy, and that, therefore, all primary policies need to be exhausted before they need to kick in the excess. Well, I mean, but the way the AGLIC policy wrote it is that it would follow the BITCO policy. It specifically says it will come after the BITCO policy. So the Beazley policy can then look at AGLIC and say, no, you're supposed to go first. I'm now excess. And that's how the trial court should have looked at it. And I'll say this, too. It's, even if you think that the trial court's interpretation was correct, or at least that it was reasonable, if there were two reasonable interpretations of an insurance coverage, then the court is supposed to find that insurance, that the insured is to be covered. Because the contracts are supposed to be read strictly against the drafters, so the insurance company. So if there's two competing interpretations, one says there is coverage, one says there isn't coverage, then the court's supposed to find coverage. Because otherwise, then that just leads to sort of a poor policy choice where insurance companies can draft sort of ambiguous contracts and then say, oh, well, you know, it's not clear, so therefore we don't have to cover it. It's the opposite. It's got to be very clear that coverage doesn't apply, and if the coverage, if it is not clear, then the court's supposed to find coverage. And that's what the court should do here. Because what you have is you have this contract, then you have the BITCO policy, which is less than what the contract provides, then you have AGLIC who comes in to provide an additional contract, and they say, once that policy is exhausted, this is to provide the excess. Is that different than what the language usually is in an excess policy? The only policy they're going to be able to reference is the named insured's other policies. Well, they could write that if there's another insured and they have a primary policy, this will follow that primary policy. But then the law generally of excess policies. Yes, but it's, when you look at how this one was written, it's not this is an excess policy only. I mean, it does, with the contract, with the BITCO, with it saying that it will follow, with the references to the contract, you have to, you should read all of that in together to, like, what is the, what is it that the company's trying to insure here? You want to read it as excess only to the BITCO policy and not excess to any other policy. Correct. That's how you want to read it. That's correct, because it does follow the BITCO policy, which it says it does. And they're reading it as excess to all primary policies. Yes, the way they would read it is that AGLIC comes in after everything else has been exhausted. So whether it's the BITCO policy, whether it's the XL policy, whether it's Beasley, whether it's another insurance company from one of the other defendants, after all of that, only then does that kick in. You're explaining to me why you think it's relevant that Arrow Road breached their contract and only provided $1 million in primary coverage rather than $2 million. Why does that matter? Well, I don't know that I would say that they breached their contract, because if you interpret the AGLIC policy the way I am, they didn't, because they provided $2 million in coverage and then the $5 million in excess, because it would follow the BITCO. So reviewing it that way, Arrow Road hasn't. Now, if you say that they did, well, then perhaps that's a different dispute. Well, you actually argue that you're looking for, that because they only had a $1 million policy, that at the very least, AGLIC should be responsible for the other $1 million. Correct. Because, again, the way it says, other insurance has a schedule, has the BITCO, it will imply an excess. So when you speak about other insurance, though, and I know your definition of other insurance is the BITCO policy, but there may be, and I know that counsel's argument is that the other insurance is all the primary insurance, including the Beasley policy. Right. And, well, and I understand that's his argument, but, again, you have to look at the contract and interpret, sorry, the policy, which is a contract, and have to interpret it. They didn't limit it to say, you know, this will follow the other insurance and any other primary insurance. It just says it will follow the other insurance in excess. They didn't put in the schedule that, you know, they couldn't put in the schedule perhaps that any other, you know, primary policy out there, you know, would apply. It was limited to what it says. They said that this insurance shall apply in excess of any other valid and collectible insurance available to any insured. No, but I think that's in the other insurance area where they're talking about just what the other insurance is, which is in the schedule, which was specifically referring to the BITCO. Didn't, I don't think that that refers to. So you don't think that the other insurance means any other insurance? Yes. So they're referring specifically to the BITCO policy. Yes. Your argument. Yeah. And what's in the schedules. Okay. And so that's when you, if you, looking at it, you know, that's how, you know, we would interpret this policy. Again, it comes back to whether or not you think that one is more reasonable than the other if you think either is a reasonable interpretation than the Court is supposed to find coverage. We're just about out of time, so if you want to make any other points, please do. Yes, Your Honor. Briefly, I just wanted to address before I sit down, and I'll be back up on rebuttal, but, you know, the issue, what to do with this case is if you find, if you find that the trial court erred and should have entered summary judgments to EXP, which I obviously think you should, then there's the question of what is remaining out there to be owed. And, you know, at this time, the record just isn't clear. The parties agreed to do the defense costs after summary judgment, and there have been some other, you know, payments that have been made, which EXP would, I mean, sorry, AGLIC would be entitled to set-offs. So it would need to go back to the trial court, you know, for a determination of what exactly the exact dollar amount is owed. Okay. And Mr. Levin, I know you're coming back, and I'm going to pray that Justice McQuarrie doesn't take any of your time away. Because I'm missing this question. But how do you reconcile your argument with the Kojima case, which simply says that we are to look at all excess policies, and then, I mean, I'm sorry, look at all primary policies, and then the excess policy kicks in? I think you need to look at how this policy was written instead of just taking their, you know, their, how they define it, you know, just because they say it's an excess or they say it's an umbrella. Just that name alone, I don't think it's dispositive. You actually have to look at how it's drafted and what it does. And because it's saying that it will follow the BITCO policy, then, you know, I don't think you should read it as an excess where there's like this severed line, which any other insurance policy now needs to come through. Generally speaking, yes, if there's policies and somebody, you know, has an umbrella policy that's, you know, after everything is exhausted, you know, this is how much your coverage is, that's correct. But here, I think the circumstances are a little different. Thank you, Your Honor. Thank you, counsel. Good afternoon. I'll just begin. Please. The point that I didn't hear talked about, in my view, enough in the initial presentation, was what Judge McFarland said. And I think that's what he led off with, which is if the settlement isn't covered, then there's no duty to identify. So the settlement has to be covered under the American Guarantee Policy before we get to any issues of policy priority. And the trial court, I think, accurately determined that the settlement itself was not covered under the American Guarantee Policy. And the trial court properly applied the standards of the duty to identify to make that determination. Which are not based on the allegations in the underlying case. But what about the fact that defense costs also were never paid by your client? Well, we've got to be clear about that. It's a complicated record. There was no exhaustion of the BITCO policy at any point prior to EXP's settlement. Right. We have an excess policy. EXP sought coverage from several primary policies. The defense costs we're talking about are defense costs that were within the scope of the Beasley policy's coverage, but there's a deductible on that policy. That's a matter of choice, an economic decision that EXP makes. If you look at the Beasley policy, there is a defense provision that says we will defend claims that seek damages covered under this policy. So these are expense costs within a deductible that EXP funded itself. While the underlying case was pending, there was declaratory litigation filed by BITCO and some other carriers as well. Under which, pursuant to which EXP was asserting this defense claim. They actually did recover some of their defense costs. That's in the record. In my fact statement, it gets pretty convoluted, but we talk about. $125,000 or something. Exactly correct. And this is a $500,000 deductible that they're trying to recover under. We're not a primary carrier. There is no case law out there that says BITCO denied coverage, so you have to file your own DJ. They're seeking coverage under the Cover J part of our policy, which only applies after the BITCO policy is exhausted. All we're talking about, to the extent that duty to defend is relevant at all, it's relevant for this indeterminate amount that they're still out. It's not at all relevant to the $2.4 million settlement. And there's never been any argument to that effect. They're truly separate issues, like the outboard case says they are. Okay. And so we can talk about the allegations that were made, because I don't agree with counsel's characterization of them against EXP. But what's in the record to show that the indemnity payment, the settlement payment, wasn't covered under the American Guarantee Policy is the engineering services contract that EXP entered into with IDOT. The testimony of the EXP representatives that testified on the underlying project, EXP observed and monitored contractors' work for specification with the Congress. This all goes to the exclusion, not to the horizontal and vertical exhaustion. This all goes to why, the evidence in the record that allowed the trial court judge to probably find that the settlement payment was not made for damages that were covered under the American Guarantee Policy. Because of the professional services exclusion. Right. And there was evidence in the form of those contracts, that testimony, that showed what EXP actually did. Okay. Counsel brought up an example today where he gets in a car accident on the way here. There was no comparable evidence in the trial court. The only evidence before the court as to what EXP actually did was the contract and the testimony that showed they provided exclusively professional services. That's what they were retained to do. We also have evidence in the form of what Beasley did. Beasley never reserved its rights. Beasley accepted coverage, never suggested that this was some sort of mixed claim and that CGL policy should be covering the claim. The professional liability carrier stepped right in and accepted coverage because it was a professional services claim. We've also got evidence in the record, and this was put in through stipulation, of EXP's conduct. EXP tended the case to their own CGL carrier, XL, and Beasley. XL denied citing a professional services exclusion, like ours. EXP didn't challenge that and accepted the coverage from Beasley. Okay. And we don't need to spend too much time on it because I realize it's not the heart of this, but on the separate issue of whether your client should have contributed to defense costs, you would look at the duty to defend rather than the duty to indemnify, right? You would look at the complaint, the underlying motorcycle person's complaint. For that limited issue of this, maybe we're down to like $370,000 and they might still be out, we would look at those standards. And did the trial court resolve that issue as well? The trial court resolved that issue by finding there was no duty whatsoever to provide coverage. Because there were excess. Because there were excess and because there was no coverage. Okay. And on the duty to defend issue, yes, Judge, the problem that they, that we don't, that EXP doesn't address are the three cases. The Shepard case from 1976, the Fidelity v. Embargo case from 1983, and the USFMG v. Continental case from 1997. All of which found there was no duty to defend in a case like this. Because of the professional liabilities. Correct. Yeah, but we do have Justice Martin's very recent case with allegations very similar to the complaint here, which did find a duty. Well, we do, and Justice Martin very, very specifically distinguished Embargo in that case. And he said, he said, the problem you've got, Carrier, in the RLI case, is you've moved for judgment on the pleadings. Right. You did not, and so I can't look at the contract that they looked at in Embargo. I can't look at the contract that they looked at in Embargo. I can't look at the contract that they looked at in the RLI. The contract would show me the exclusion is applicable. It would prove that. I see. That's what happened in Embargo. That's what didn't happen in RLI. And Judge Martin's very specific about that. He says, I can't look at this. Well, what he did was say the trial court improperly looked at that contract. The trial court wasn't supposed to do that on a motion for judgment on the pleadings. And then he went further and said, this contract shows that the insured exclusively provided professional services, but it wasn't properly before the court. So we've got three, you know, this has been the law. I've been doing this a while. This has been the law in the state for, you know, since 1976, that the professional services, the professional liability carrier comes in in these cases and defends the engineer and defends the architect. Okay. If you go back and look at Sheppard and Byrdine and Continental, those insurers, okay, well, two were engineering firms, one was an architectural firm. They were accused of negligence and violation of the Structural Work Act in connection with a construction accident. So they were accused of having charge of the work. That's the old Structural Work Act language. In all of those cases, the appellate courts said, we know what they were doing on the job. They were providing professional services. And these exclusions, they apply to liability that arises out of professional service, rendering or failure to render. So that's that broad language, I'm sorry. But aside from the, from all of that, the, if the litigation costs were not covered by that settlement, that necessarily, so your position is that your client may still be liable for the litigation costs on the failure to defend, the duty to defend. My position is we had no duty to defend under Sheppard and Byrdine and Continental. Well, based on the allegations of the complaint, though, you still look to the allegations of the complaint on the duty to defend. Correct. And the allegations of this complaint were no different than they were in these three cases that are controlled. Well, first of all, those cases are different. They're actually alleging that they didn't put signs up, that they were responsible for the manhole being raised and all of that. So I think that the duty to defend would have been there had that been the only issue in this case. It's just that because there was a resolution of the case, we're now talking about duty to indemnify. So let's put duty to indemnify aside for a second. And there would still be a duty. Well, like I say, there would be. But there's an issue as to whether or not there would be a duty to defend based upon the allegations of the complaint. Well, counsel has suggested to you that EXP was accused of not properly ramping the manhole. That isn't what they were accused of. When you look at the complaint, it alleges specifically, this is paragraph 75 of the underlying complaint. It alleges that, and this is at C-99 in the record. It alleges that EXP provided services described as, quote, program management, staffing advice, and identification and mitigation of proper risks. That is what EXP is alleged to have done on the underlying project. The complaint then goes on to allege that at the time of the underlying incident, EXP retained authority and control over project management, staffing, and identification and mitigation of proper risks, but that EXP breached those duties in the provision of management and control of the project. So there's nothing in the underlying complaint that alleges EXP was out there literally putting the band around the manhole cover to ramp it. They're accused of not identifying a proper risk. They're accused of not doing work properly as an engineering consultant. Okay? And if you contrast those allegations or you compare those allegations to what's alleged in Shepard and Virodine and Continental, you'll see there, if anything, the allegations that were found not to trigger a duty to defend in those older cases are far more direct in accusing the insured engineer of having actual responsibility for the physical work. In fact, in Virodine, the insured was accused literally of failing to properly assemble a scaffold, okay, that the worker fell off of. But in Virodine, the court, after looking at the contract, the insured's contract, and considering the testimony from the underlying case as to what the insured did, both of which are on the record here, in Virodine, the court found no duty to defend. No duty to defend because of the professional services exclusion in that CGL policy. And if you go back and look at Continental, Continental was interesting because it was exactly this case. In Continental, it was the insurance professional liability carrier that was arguing that the CGL carrier had the duty to defend, and they were doing what we're doing here. They're pointing at each other. And in Continental, this is 1997, the court said, you don't defend the CGL carrier. You do defend professional liability carrier. And again, and that was a case where the, it was an architect, was accused of violating the Structural Work Act, and we all remember those cases. They were accused essentially, along with the general contractor, of not putting equipment together correctly, which is, you know, not a professional task. But because of the wording of the exclusion, which negates coverage for bodily injury arising out of the rendering of failure, or failure to render professional services, and the fact that the courts have determined we can look at what the insured was actually doing because it doesn't go to the insured's life, because it doesn't determine an issue of life. And let me get to the access issue. And the access issue, the problem, there's one technical problem we've got to talk about here, which is that this whole million-dollar shortfall that counsel begins his analysis with was not brought up in the briefing of the motions for summary judgment. And our judge, our trial court judge, declined to consider it in his motion to reconsider. The motion to reconsider. We did take your motion with the case. Let's assume they want to consider it. Okay. Because it's really not a new claim. It's a new argument as to why there's coverage. The problem with it is that it boils down to, you're quite correct in that our policy says we're access to primary policies. His response to that is that the contract and the insurance requirements on the project required that Arrow's excess coverage drop down below EXP's primary coverage. But it didn't. The contract documents required Arrow to maintain umbrella liability insurance. Okay. There are two subdivisions. Arrow, you get CGL insurance. Arrow, you get umbrella liability insurance. The umbrella liability insurance requirement said it should be not less than $5 million. And it should apply on each occurrence basis, on a per project basis, this is a quote, excess of the underlying policy limits. Okay. So the contract was very clear that Arrow's excess coverage was not going to be required to drop down below anybody else's primary limits. Okay. And this gets into the North River case, which we cited. The exact same argument was before the court in North River. Where the CGL carrier said, hey, the excess coverage was supposed to fall afloat. The additional insurance carrier, excuse me, said, because the excess coverage was supposed to fall afloat, just like I could jump over the CGL coverage, I can jump over the excess coverage. And the North River court found, no, if the contract, the insurance requirements, distinguish between CGL coverage and umbrella coverage, we're going to presume that the parties know the law, which is that primary coverage exhaust before excess coverage, as you were pointing out through Kojima. And so this case is even better for us than North River was, because in this case, in that case, the court said there's no drop-down coverage simply because the requirements distinguish between CGL and excess coverage. Here, the insurance requirements say the umbrella coverage is going to apply excess of underlying policy limits. That couldn't be more clear. There was no expectation of these contracting parties of, you know, Passion and Arrow, that Arrow was supposed to go get an umbrella policy that dropped down below other people's primary policies. Then you factor in the point that the contracts, the board contracts, also required EXP to maintain professional liability insurance. That was in its contract, its direct contract with IDOT, that EXP had to maintain primary professional liability insurance. And there's no way you can construe these requirements as contemplating that Arrow's excess coverage would go before Beasley's professional liability coverage. So the premise of his argument that we go next, right after VITCO exhausts, is that the contracts require it, but they don't. So because they don't, we're just Kojima applies. Does that make sense? It's your argument. Do you know how to argue whatever you want? To me, the main point is that to rule in their favor, you've got to disagree with Shepard and Byrdine and Continental. I'll ask you the same question I asked the opposing counsel. If we agree with you on either of these points, either that Kojima applies and their, you know, your coverage is completely excess, or we agree with you on the exclusion, in either case, it needs to be deferred. Correct. And the trial court found both. You could find either, and the result would be the same. The only other argument, I don't want to take too much of your time, I know I'm running out, is the waiver argument. Because I do think it gets lost in the shuffle here, which is that if Beasley, okay, forget about EXP for a second, if Beasley did exactly what EXP is doing, which is accept coverage without reservation, never knock on AIG's, I meant AIG's, American Guaranty's door or any primary carrier, accepted coverage, paid the claim, and moved on, then a year later decided to sue a bunch of other carriers and saying, hey, you should have paid, every court would say they waived the right to do that. Other conduct, okay? EXP is Beasley's assignee here. So. They can only have the rights that. Exactly. So why are we even here? If this was Beasley, this would have taken about ten minutes. Did you make that argument in the trial court? Yes, I did. And I made it on these briefs as well. Yes, there's plenty of these briefs. Yeah, there's plenty in the briefs. But I honestly think that's a simpler way to get there. And this is just, again, there's, you know, the law in this area is pretty clear, that the professional services, you know, based on three cases I cited, that they defend the engineer, the architect in these situations. But the other policy point is, if EXP is able to just reopen this, you know, a year, as Beasley's assignee, and say, yeah, you know, so what, they accepted coverage. So what, they accepted that reservation. So what, they defended and settled the case and basically had the case for two and a half years. We want to now chase other carriers a year, two years later. You know, that raises a policy implication that these cases aren't going to be finished. So I think that's an argument that we haven't talked about enough, but I honestly think that's the quickest way to dispose of this. If Beasley was sitting over there, this would be a much shorter argument, and there's no reason it's any different. Thank you. Thank you, counsel. Thank you, Your Honor. No wonder, as a technological agent, I could pull the record up. So I wanted to just cite in the underlying complaint some allegations that weren't raised on C101, page 14, the underlying complaint. EXP has alleged that they didn't adequately sign or warrant oncoming traffic to a known hazard and or grade, supervised, sorry, didn't close the road to traffic, despite its knowledge of the known hazard, to motorists, and also that they didn't demand that signs or markings of known hazard be presented by the unramped elevated manhole structure to be placed. I mean, those are allegations that are not within the professional services, because you do not need to be a professional to know that a raised manhole cover on a highway is going to potentially cause somebody harm. You know, counsel is talking about the contract that EXP had and the deposition testimony, but that's not related to what happened on the day of the incident. That's just what EXP does and who they are, but who the person is isn't the analysis. It's what are they alleged to have done when it comes to the duty to defend. And furthermore, you know, Thomas Engineering, we talked that that was on judgment on the pleading, so the standard is a little bit different than summary judgment. But in the Dominick Finer Foods case, Justice Ellis wrote a few years ago, the court looked through a duty to defend analysis that looked at the complaint, and then on the duty to indemnify, it went right back to the 12th Amendment complaint. I think it's paragraphs 85 through 87, where it looked to the allegations of what was in the complaint to determine whether or not the duty to indemnify was triggered, and they found that it was. And so while extrinsic evidence certainly can be introduced to show the duty to indemnify doesn't apply, that doesn't mean that you can't look at the complaint, especially when you're dealing with a circumstance here where there was a settlement after mediation. We don't have a trial record. We don't have a jury finding. You know, we're left with a situation where somebody, where EXP settles, facing a risk, and then, you know, the cases have stated, you know, just now then turn around and force the person who just settled and said that they weren't liable, but they'll settle to end it to now prove that they were liable. You know, because it kind of puts people in an awkward position, that you're settling, saying I'll pay this, but I don't think I'm liable. Now all of a sudden I get my insurance, go, oh, yeah, no, that was my fault. How do you respond to the argument, though, that there's the waiver, because Beasley did not settle under Reservation of Rights? Beasley never, the comment was they never made that phone call to American Guarantee. Well, yeah, sure. So, you know, EXP wrote numerous letters to AGLIC. That's in the record. They wrote letters saying, well, you're insured. We have a mediation. We have liability. You know, please come to the mediation and contribute. And they did nothing. And after the mediation, another letter was sent. And it wasn't until I think, I think the mediation was in March and in October there was a letter saying we deny coverage. You know, they were certainly on notice that EXP was, you know, stating that they were insured, that they should be covered. Beasley came in and paid it. Now, when we're talking about waiver, I think that comes out of the home versus Cincinnati case out of the Illinois Supreme Court, and it's talking about equitable remedies. Well, in that case, you have two primary policies who are both liable, and then there's a determination of, you know, who's going to pay what. And if you don't raise that to the other side, like I want you to pay 50 percent, I'll pay 50 percent as an example, then you waived it. But in that very same opinion, the court cited Shaw v. Bogick from this court, which said that when you're talking about an excess versus a primary, those aren't equitable. You know, that's not an equitable remedy. It's not an equitable situation because it's a legal situation. Because if you're the person who should pay first, you know, that's a legal question. It's not you're both liable and you're trying to figure out who's going to pay what share. So the waiver analysis based on home I don't think applies in this situation, at least as far as we're, you know, explaining how the policy should be interpreted. So, you know, I think it also, if you look at, you know, the Shaw case, it also says that, you know, you don't have to necessarily give like a formal tender to the insurance company if the insurance company already knows about it because it says that it creates, you know, an unnecessary loophole that doesn't provide any real benefit other than to the insurer. Because if the insurer knows about it, they can sit and, you know, be quiet even though they know about something and then show up later and say we're not going to cover. And the court said, you know, you can't do that. So I do also want to briefly mention the other waiver argument about the million dollars. You know, this gets into you have so many pages. I mean, the argument was raised that the insurance, that the contract did apply and that the insurance coverage policy does reference the contract. You know, that was in the response to the motion for summary judgment. I think it's like 1309. It does raise that. Later on it says, well, more specifically, here's the million. So it expands on an argument already raised. It's not injecting a new argument, you know. And so there you're arguing that American Guarantee is at the very least responsible for that million dollars based upon their own language that they're going to follow the form of the big co-contract. Yes, at the very least. Or the big co-insurance policy. Yes, at the very least. But yes, for sure, I think. If you want to say that the excess part of the contract is access to everything else, you still have the million dollars that was supposed to be provided for primary coverage, and then you have the AGLIC contract, which says that it will follow the underlying insurance. So I think that it should follow completely, but to the extent that there's a limitation, it would be at that million dollars, as well as for identification, as well as at the defense costs. I'm probably running out of time, so I just want to, you know. Any other questions? No, thank you. Pardon. Yes, of course. I'm going to come back. I'm going to just let you ask the question. Sure. Well, I guess. If that would help. Yeah, I did. Well, what I'd like to do, Mr. Vaughn, and I preside, and Justice has given me permission to do this, is I think you were done arguing. We're going to have you come back in just a moment. We want to turn this to O'Gallagher to address the issue of the $1 million that you're referring to. Okay. You understand the argument, correct, Mr. O'Gallagher? Because I'll repeat it if you didn't, if you weren't listening, because I know it is sometimes. I'm not sure I got everything. Yeah. Well, the contract provided, the contract that Arrowhead, Arrow Road had with Passion, was that they were supposed to have a $2 million policy, and then there was a $5 million access, because they only had a $1 million policy, and that Mr. Vaughn is arguing that it's clear from the American guarantee policy that they're going to follow the form of the Bitco policy. And if the Bitco policy only provided a $1 million policy when it was supposed to provide a $2 million policy, at the very least, American guarantee is on the hook for that $1 million. If they're following the form, if we were to read their policy to its form, to its true form. So we're going to give you an opportunity to respond to that. And then we'll have Mr. Vaughn come back to give the final word on it. Still got the last word. Yeah. And we'll build that into a place just so I'm sure your voice ends up on the tape. Yeah. A couple things with that, Judge, and I don't have the language in front of me, but the American guarantee policy says it follows form and it makes exceptions. One of the exceptions is limits. So if, you know, the limit of the Bitco policy is $1 million, Bitco may have signed, the allegation is Bitco signed a contract where it should have, I'm sorry, Arrow signed a contract where Arrow should have gotten a CGL policy that had $2 million. Okay. That's not an issue of us following form. That's got nothing to do with the Bitco policy or the American guarantee policy. That has to do with whether or not there is a claim against Arrow for not getting the right amount of insurance. But that in no way, if Arrow signed a contract it shouldn't have, that doesn't mean that we drop down below the Beasley policy, which is a primary policy. That might mean that somebody has got a claim against Arrow for not getting the right amount of coverage. Now, I don't know who is going to assert that claim. It wouldn't be EXP because EXP has no damages. Beasley paid what it was supposed to pay under its policy. 2.45. Right, right. So EXP is not out any money because Bitco didn't go get a $2 million CGL policy. So, you know, I don't know who can prosecute that claim, but it doesn't affect the priority of the policies that are in the record here. And then it gets to this, well, we've talked about that other issue, about how it was presented in the trial court and those things. But I don't, and then the secondary argument is, again, to the extent the contract is relevant here, the contract said that Arrow's excess policy would apply over underlying primary limits, which include the Beasley policy because that was also a policy required by the contract documents. So that's kind of where I'd go with those issues, Judge. Does that answer your question? It does. Thank you, Counsel. Again, you get the last part, but just limited to that. Very last brief. Two issues. One, on damages, I mean, that completely ignores, we're saying there's no damages to defense costs, which the Bitco policy should have defended. AGLIC should have defended. And, you know, as well as, as I said, you know, to figure out what the costs are, it would need to be remanded back to determine, you know, what, if anything, there are, whether there are additional indemnification costs or defense costs. So there are damages. It's not there are none. And then, you know, I think it's interesting that when we're discussing whether EXP should be indemnified, we have to look, AGLIC wants us to look at the contract that EXP had, you know, as that's all you need to consider to determine whether or not they were professional services, but we're determining whether or not Arrow Road procured enough, secured enough insurance. We're not going to look to their contract. They're like, well, if they breached it, they breached it. You know, we have nothing to do. I think if Arrow Road has a contract that they're going to provide the $2 million and then they go out and get insurance and there's an interpretation that BITCO is then followed by AGLIC, then Arrow Road, you would think, you know, the intent was to get that at least $2 million coverage. I think there would be more, but at least the $2 million coverage in order to meet the contract. They want you to make an determination that, you know, Arrow Road breached its contract. But, again, and this will be my closing point, if there are, you know, if the contract is ambiguous or there are multiple reasonable interpretations, the court is supposed to find that there will be coverage. It is to be interpreted against the insurance company who drafted the policy. So if you find that he's right, I'm right, or either one of us could be right, then you should reverse the trial court and remand back for a hearing on what the actual damages are. So thank you, Your Honor. Well, Beasley did cover the litigation costs, though, in this case. No, Beasley covered the settlement costs. Only the settlement, not the litigation costs. So your client paid its own litigation costs. Yes, they've never been reimbursed for those. But if we find that the American Guarantee Policy was an access policy such that there was no duty to defend, then that would change that. But if we found that there was a duty to defend, it was not an access policy, then you would be looking for that as well as all the other things. Yes, we find there's a duty to defend, and they should have defended that way. It's kind of either way. It's all or nothing either way. It's not. Okay. Thank you. Thank you both. We will take this matter under advisement, and you will hear from us shortly.